## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAXWELL J. KIMPSON,                          :
     302 Redland Boulevard                 :
     Rockville, Maryland 20850             :
                     :
        Plaintiff,                     :
                     :
     v.                                   :    Case No.
                     :
FANNIE MAE CORPORATION,                      :
     3900 Wisconsin Avenue, N.W.           :
     Washington, D.C. 20016                :
                     :
        Defendant.                     :

## COMPLAINT

Comes now Plaintiff, Maxwell J. Kimpson, through his attorneys THOMPSON

O'DONNELL, LLP, and for his Complaint against Defendant states as follows:

### THE PARTIES

1.       Plaintiff, Maxwell J. Kimpson (hereinafter "Mr. Kimpson"), whose address is

302 Redland Boulevard, Rockville, Maryland, 20850, is a former employee of Defendant.  Mr.

Kimpson was wrongfully terminated by Defendant on April 5, 2005.

2.       Defendant, Fannie Mae Corporation, formerly known as the Federal National

Mortgage Association (hereinafter "Defendant" or "Fannie Mae"), whose address is 3900

Wisconsin Avenue, N.W., Washington, D.C. 20016, is a publicly traded corporation, registered

with the Securities and Exchange Commission under § 12 of the Security Exchange Act of

1934.

### JURISDICTION

3.       This case arises under the whistleblower provisions of Public Law 107-204,

Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the

Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (hereinafter "Sarbanes-Oxley") enacted on July 30, 2002. Pursuant to 18 U.S.C. § 1514A (b)(1)(A), an employee who alleges discharge in violation of Sarbanes-Oxley must first file an administrative complaint with the Secretary of Labor in order to seek relief. The Secretary of Labor has delegated responsibility for handling such complaints to the Occupational Safety & Health Administration.[1]

4.      Pursuant to 29 C.F.R. § 1980.114 if the Secretary of Labor does not issue a final decision within 180 days of the filing of the complaint than the employee may file suit in an appropriate United States District Court.

5.      Plaintiff filed his complaint with the Occupational Safety & Health Administration on June 30, 2005. The 180 day waiting period required under 29 C.F.R. § 1980.114 ended on December 27, 2005. A final decision has never been issued in this matter and accordingly, Plaintiff is entitled to bring suit in this Court.

6.      Therefore this Court has jurisdiction under 28 U.S.C. § 1331, which states, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

### VENUE

7.      Venue is proper in this Court as the Defendant maintains its principal office within the District of Columbia, and all events relevant to this Complaint took place within the District of Columbia.

### SUMMARY

8.      This is an action for damages and other relief under the Sarbanes-Oxley Act of 2002. Mr. Kimpson was employed by Defendant Fannie Mae to manage its outside

---

[1]      Secretary's Order 5-2002; Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupation Safety and Health, 67 Fed. Reg. 65008-01 (Oct. 22, 2002).

procurement contracts. During the course of his employment, Mr. Kimpson repeatedly complained to his supervisors about the unconventional and wasteful contract and accounting practices utilized throughout his department. These supervisors had no formal education or training in accounting and contract procurement practices. Among the improper practices that Mr. Kimpson criticized was the formula used by his supervisors to determine their annual bonuses. The formula grossly inflated the bonuses received by these supervisors. During the course of Mr. Kimpson's attempts to rectify the bad practices at Fannie Mae, the corporation came under intense media and public scrutiny. In an attempt to avoid culpability for the fraudulent, wasteful, and abusive practices criticized by Mr. Kimpson, these supervisors conspired to fire him. His firing removed him from the workplace during critical audits of his department. Despite his firing, these audits eventually exposed the fraudulent, wasteful, and abusive practices of the department. Mr. Kimpson was ultimately vindicated by the release of the Office of Federal Housing Enterprise Oversight audit findings, as well as the release of the findings of an internal audit. These audits confirmed that Defendant Fannie Mae did, in fact, utilize improper and wasteful practices as Mr. Kimpson had charged. He now seeks redress for having been fired in violation of the Sarbanes-Oxley Act.

## BACKGROUND

9.      Mr. Kimpson holds a Masters in Business Administration from Georgia State University and a degree in Applied Physics from Morehouse College. Prior to joining Fannie Mae, Mr. Kimpson spent nearly ten years working at the Atlanta office of the Environmental Protection Agency, where he gained extensive experience in financial and accounting matters. At the EPA, Mr. Kimpson worked variously as the Contracting Officer's Technical Representative, a Contracts Project Officer, and a Revolving Loan Fund Manager. After a

3

summer internship with Fannie Mae in 1999, Mr. Kimpson was hired as a full-time employee on August 28, 2000, in the position of Contract Procurement Specialist within the Contract and Procurement Services Department.

### Contract And Procurement Services Department

10.     Fannie Mae's Contract and Procurement Services Department (hereinafter "CAPS") manages the acquisition of goods and services necessary to maintain Fannie Mae's day-to-day operations. This Department is divided into two subparts: the Contracts Department and the Procurement Department. The Contracts Department is charged with negotiating all of the contracts for the personnel, materials, equipment, and licensing needs of Fannie Mae to operate its numerous facilities located across the nation. These contracts are either specific quantity and cost agreements or general service agreements under which the specific quantities and costs are determined on a requisition and purchase order basis.

11.     Once these contracts are negotiated, the Procurement Department reviews the contracts and authorizes the funding associated with each contract. In order to authorize funding for requisitions and purchase orders, the Procurement Department must ensure that the requested expenditure is authorized by the underlying general services agreement.

12.     CAPS maintains several levels of supervisors who answer to the Vice President of Financial and Procurement Services, Christine Cahn (hereinafter "Ms. Cahn"). Ms. Cahn's duties include overseeing the operations of the entire CAPS Department.

13.     Managing Directors supervise the operations of each department within Fannie Mae. Anne Stilwell (hereinafter "Ms. Stilwell") was the Managing Director of CAPS at all time material to this Complaint. As Managing Director, Ms. Stilwell oversaw day-to-day operations of CAPS by supervising the performance of the Directors within that Department.

4

As Managing Director of the entire Department, Ms. Stilwell reported directly to Ms. Cahn. Upon information and belief, Ms. Stilwell has only a high school education and lacks any formal education in accounting or business administration.

14.    Directors manage the numerous subparts found within each department at Fannie Mae. Mia Cole (hereinafter "Ms. Cole") at all times relevant to this Complaint was a Director of Contracts within CAPS. Specifically, Ms. Cole supervised contracts related to women and minority-owned businesses by overseeing the Managers who worked in those areas. Ms. Cole reported directly to Ms. Stilwell. Upon information and belief, Ms. Cole holds a masters degree but lacks any formal education in accounting or business administration.

15.    Marge Lopez (hereinafter "Ms. Lopez") at all time material to this Complaint was also a Director of Contracts within CAPS. Specifically, Ms. Lopez supervised the technology-related contracts by overseeing the Managers who worked within that area. Ms. Lopez reported directly to Ms. Stilwell. Upon information and belief, Ms. Lopez held a masters degree in engineering, but lacks any formal education in accounting or business administration.

16.    Rosanne Martin Edler (hereinafter "Ms. Martin Edler") at all time material to this Complaint was a Manager within the Contracts Department. As a manager, Ms. Martin Edler supervised the contract procurement specialists, including the senior contract procurement specialists. Ms. Martin Edler reported to the Directors in her department, as well as to Ms. Stilwell. Ms. Martin Edler was Mr. Kimpson's immediate supervisor. Upon information and belief, Ms. Martin Edler held a bachelors degree in physical education, but lacks any formal education in accounting or business administration.

### Mr. Kimpson's Performance
### As a Contract Procurement Specialist

17. As a Contract Procurement Specialist, Mr. Kimpson focused on fulfilling Fannie Mae's marketing, telecommunications, and product licensing needs. In order to fulfill these needs, Mr. Kimpson researched and compiled information regarding the different vendors offering products, services, and personnel for those areas. Mr. Kimpson then analyzed and compared vendor services to determine the most cost efficient vendor to employ. Upon making this determination, Mr. Kimpson would introduce the chosen vendor to management and assist in negotiating a contract. By entering into a contract with management, those vendors became approved vendors. Needed products and services were only to be requisitioned from properly approved vendors

18. As Contract Procurement Specialist, Mr. Kimpson constantly evaluated the specific products and services needed by Fannie Mae. Mr. Kimpson focused on fulfilling Fannie Mae's software, marketing, and licensing needs. When a specific need arose, Mr. Kimpson would requisition the needed product or service from an approved vendor.

19. In early 2003, Ms. Stilwell and Ms. Cole conducted a year-end evaluation of Mr. Kimpson's employment for the year 2002. This review describes Mr. Kimpson as a highly valued employee who made significant contributions to the organization. This review praises Mr. Kimpson's ability to meet demands despite an incredibly heavy workload. Mr. Kimpson is further praised for introducing vendors that would save Fannie Mae hundreds of thousands of dollars. The overall findings of this review describe Mr. Kimpson as an employee who consistently exceeded expectations. A copy of this evaluation is attached to this Complaint as Exhibit A.

### Mr. Kimpson's Promotion To
### Senior Contract Procurement Specialist

20.    In March of 2003, in recognition of his outstanding employment history, Mr. Kimpson was promoted to the position of Senior Contract Procurement Specialist. As a Senior Specialist, Mr. Kimpson became responsible for managing Fannie Mae's information technology staffing needs. This new responsibility required Mr. Kimpson to locate vendors providing personnel capable of handling Fannie Mae's information technology needs. Once these vendors were located, Mr. Kimpson negotiated over eighty separate contracts, thereby placing over six hundred contract employees throughout Fannie Mae.

21.    Once these contracts were negotiated, Mr. Kimpson became responsible for ensuring that vendors were complying with the terms of their agreements. This required Mr. Kimpson to supervise all of the requisitions and work orders that corresponded to each general service agreement. As a result of this promotion, Mr. Kimpson was exposed to the process and policies used throughout the Contract and Procurement Services Department.

22.    At the time of Mr. Kimpson's promotion, the supervisors of CAPS lacked any expertise in financial accounting or business administration. The Managing Director, Ms. Stilwell, who was responsible for overseeing the entire Contracts and Procurement Services Department, had no accounting training, and held only a high school degree. The Directors, Ms. Cole and Ms. Lopez, while holding college degrees, had no training related to accounting or business administration.

23.    Management's lack of proper accounting training resulted in the Department employing unconventional and improper policies thereby causing inefficiencies, fraud, waste, and abuse that adversely affected the financial viability of Fannie Mae.

24.    Mr. Kimpson possessed the accounting and business administration training that the Department supervisors sorely lacked. His promotion exposed him to the flawed practices

7

of the Department. He possessed the education, experience, and insight to recognize the improriety of such practices.

### Mr. Kimpson Reports His
### Concerns Regarding Fannie Mae Practices

25.    Prior to his promotion, Mr. Kimpson questioned some of the practices being utilized within the Department, but he felt that he lacked the necessary seniority to effectuate change. With his promotion, Mr. Kimpson became privy to additional serious flaws in CAPS previously unknown to him. At that point, Mr. Kimpson realized that the entire Department utilized improper accounting practices. Mr. Kimpson was aware by education and training of the business risks associated with such practices.

26.    Accordingly, On March 10, 2003, Mr. Kimpson sent an email message to Ms. Lopez and Ms. Stilwell, raising his concerns regarding the financial and contractual practices then in use at Fannie Mae. In this message, Mr. Kimpson expressed concerns regarding the review and approval of contracts and vendors. Specifically, Mr. Kimpson expressed concerns regarding the use of vendors not properly approved by management.

27.    The vendor approval process is essential to protect Fannie Mae from waste, fraud, and abuse. Through the use of non-approved vendors, management might place contracts with unqualified contractors, interested third-parties, or with corrupt contractors willing to offer kickbacks. Mr. Kimpson realized these risks and, therefore, informed Ms. Stilwell and Ms. Lopez of the impropriety of using non-approved vendors.

28.    Mr. Kimpson also expressed concerns regarding the lack of clearly stated policies for processing of work orders under general service contracts. Under the Fannie Mae policy, it was unclear whether work orders were required for all vendors. Requiring work orders ensures the proper review and approval of every expenditure prior to disbursement.

Without a work order, there was no way to determine exactly what was ordered, who was to provide the product, and when the product was to be provided. This created an enormous potential for waste, fraud, and abuse, as employees were able to spend funds without any evidence of how the money was spent.

29.    Mr. Kimpson also objected to the Fannie Mae policy regarding signature authority for purchase orders submitted by contractors. Under Fannie Mae policy, Ms. Cahn, as Chief Procurement Officer, was the first level of management authorized to sign purchase orders in excess of one million dollars. The Controller, CFO, and COO could also authorize these transactions. This requirement was intended to ensure proper review of any significant expenditure in order to protect against waste, fraud and abuse. Mr. Kimpson realized that nothing prevented employees and management from creating multiple purchase orders for the same vendor, each for less than one million dollars, thereby avoiding the signature requirement. The Fannie Mae practice lacked any means of ensuring the proper authorization of significant levels of funding by management.

30.    Mr. Kimpson immediately expressed concern to Ms. Stilwell and Ms. Lopez that the Department lacked clear policy as to whether signature authority for purchase orders should be determined based on the dollar amount in each purchase order, or on a cumulative basis for all purchase orders for a given vendor. A copy of this message is attached to this Complaint as Exhibit B.

31.    On March 24, 2003, Mr. Kimpson sent an email to Ms. Lopez and Ms. Stilwell, expressing concerns regarding Fannie Mae's requisition process. Specifically, Mr. Kimpson pointed out that employees were generating purchase orders without comparing the purchase order with the underlying contracts.

32.     Under the Fannie Mae requisition policy, supervisors allowed employees to approve requisition requests and generate purchase orders without reviewing the underlying contracts. In effect, the supervisors expected employees to simply "rubber stamp" approvals on requisitions without comparing the request to the underlying contract. The supervisors allowed this process under the mistaken belief that it would streamline the vendor supply process and make the Department appear to operate efficiently.

33.     Reviewing the underlying contract ensures that every requisition request conforms to the agreement authorized with that vendor. Without being able to review the underlying contract, employees had no way to determine whether the funds requested should be disbursed. Furthermore, the Fannie Mae requisition and purchase order process prevented employees from verifying that there was in fact an agreement between Fannie Mae and the vendor making the request. This practice allowed vendors with expired contracts and vendors without any valid contract to receive funds from Fannie Mae. This practice prevented the proper review and verification of requisition requests, and therefore created a serious risk of waste, fraud and abuse for Fannie Mae. A copy of this message is attached to this Complaint as Exhibit C.

34.     As part of his review of the Fannie Mae policies, Mr. Kimpson repeatedly warned that the Department lacked any formal policies or control mechanisms to ensure the proper review and approval of requisitions and purchase orders. The only policy manual available for employees was an outdated 1999 Policy and Procedure Manual that no longer reflected the actual practices of the Department. The absence of stated policies or controls fostered an environment in which fraudulent transactions could occur.

35.     Sarbanes-Oxley was enacted on July 30, 2002. Sarbanes-Oxley mandated that Fannie Mae conduct a Risk Assessment and create Mitigating Controls in a newly-stated Policies and Procedures Manual. Pursuant to Sarbanes-Oxley, the Risk Assessment and creation of Mitigating Controls had to be completed by the end of the fiscal year that ended on April 15, 2005. The supervisors within CAPS ignored these requirements and refused to implement any mitigating controls. Instead, Fannie Mae operated under a 1999 Policy and Procedure Manual that did not even reflect the actual practices of the Department.

### Fannie Mae's Retaliation Against Mr. Kimpson

36.     Mr. Kimpson's concerns called into question the fundamental practices utilized throughout CAPS . The supervisors were either too ignorant to accept the wisdom of these changes or resisted change because it would reflect adversely on their management skills.

37.     Acknowledging Mr. Kimpson's complaints would serve as recognition that the practices used by that Department for the last several years were deficient and improper. Recognition that the supervisors of that Department allowed the continued use of such improper practices would expose their gross lack of accounting experience and training. Upper management would become aware that the supervisors of that Department were not qualified to be directing the operation of such a vital aspect of the corporation. Therefore, making the changes that Mr. Kimpson requested would likely lead to the termination or demotion of the supervisors of that Department.

38.     Additionally, the supervisors were fearful that making such changes would slow the requisition process, thereby making the entire Department appear less efficient. Appearing less efficient would displease upper management, thereby jeopardizing bonus awards for the supervisors of that department.

11

39.      Rather than responding to these concerns, Mr. Kimpson's supervisors began a campaign of harassment, intimidation, and false criticism aimed at coercing him into resigning. Removing Mr. Kimpson would allow management to continue using erroneous and self-serving practices without risking exposure to upper management.

40.      Ms. Stilwell, Ms. Lopez, and Ms. Martin Edler routinely created unrealistic deadlines for Mr. Kimpson and then attacked him for not achieving them. These supervisors reprimanded Mr. Kimpson for his continuing expression of concern regarding the accounting practices used in the Contract and Procurement Services Department. Ms Lopez specifically directed that Mr. Kimpson "not think", but rather simply follow directions. Mr. Kimpson repeatedly requested authorization to attend training classes related to his position, but his supervisors routinely denied such requests in order to discourage him and to be used against him in his performance appraisal.

41.      In July of 2003, Mr. Kimpson sent an email message to Ms. Lopez, Ms. Stilwell, and Ms. Cahn, concerning the inappropriate expectations being placed upon him. Mr. Kimpson stated that the deadlines established for projects were unrealistic and failed to take into account external factors that would prevent such deadlines from being met. The creation of such deadlines represented a combination of the supervisors' lack of understanding regarding the amount of time necessary to properly transact business, as well as a determination to ensure Mr. Kimpson's failure. The creation of unrealistic deadlines further evidenced these supervisors desire that employees simply "rubber stamp" transactions rather than properly reviewing and verifying them.

42.      In the July email message, Mr. Kimpson further expressed concerns regarding his supervisors' refusal to approve his requests to attend training classes. These supervisors

12

continued to deny his requests to attend professional development classes, or industry-specific conferences, all while routinely authorizing other employees to attend similar events. By denying Mr. Kimpson this training, the supervisors anticipated that he would not further rise through the ranks at Fannie Mae. In addition, he would not be in a position to expose the impropriety of the Fannie Mae policies.

43.    In the July email message, Mr. Kimpson also expressed concerns regarding his supervisors' continued practice of scheduling meetings without including him, or providing little notice of such meetings in hopes that he would be unable to attend. By excluding Mr. Kimpson from these meetings, or providing inadequate notice of such meetings, these supervisors forced Mr. Kimpson to complete projects based upon second hand, and often incomplete, information. These scheduling issues represented another tactic used by the supervisors of CAPS aimed at preventing Mr. Kimpson from fulfilling his responsibilities, and thereby jeopardizing his continued performance.

44.    At the end of the July email message, Mr. Kimpson asked that his concerns be addressed and that he be provided a response. The supervisors ignored Mr. Kimpson's concerns. A copy of this message is attached as Exhibit D.

45.    Throughout 2003, Ms. Stilwell, Ms. Lopez, and Ms. Martin Edler continued to engage in practices aimed at preventing Mr. Kimpson from completing his assignments. Such practices included Ms. Lopez verbally changing Mr. Kimpson's assignments, by informing him that she would be completing certain aspects of his assignments. Ms. Lopez would then complain in writing that she was doing too much of Mr. Kimpson's work, or that he was not completing everything originally assigned to him.

46.    All three of these supervisors routinely made conflicting demands on Mr. Kimpson to ensure that no matter what efforts he made, at least one supervisor could complain.

47.    As another tactic to undermine Mr. Kimpson's job performance, these supervisors intentionally waited until August of 2003 to inform Mr. Kimpson of the objectives he was expected to achieve for that year.  Fannie Mae normally provided employees a description of their objectives at the beginning of each year.  These objectives established parameters for each position, thereby allowing employees to focus their efforts towards achieving their objectives.  Fulfillment of these objectives then became the basis for the annual review process.  By delaying in providing Mr. Kimpson his objectives, these supervisors succeeded in preventing Mr. Kimpson from directing his efforts at achieving those objectives for the first eight months of the year, thereby ensuring a poor year-end evaluation.

48.    In February of 2004, Mr. Kimpson expressed concerns to his supervisors regarding their approval of an amended purchase order, despite not having all of the required paperwork and authorizing signatures.  Mr. Kimpson expressed his concern after Ms. Martin Edler ordered that he process the purchase order, despite it not having the required authorization signature, or the corresponding paperwork.  In response to Mr. Kimpson's concerns, Ms. Martin Edler criticized Mr. Kimpson and told him that he needed to be more flexible in his application of the rules and procedures of the Department.   Furthermore, Ms Martin Edler directed that Mr. Kimpson simply follow the directions of his supervisors and not independently analyze those orders.  Mr. Kimpson responded to Ms. Martin Edler's criticism by reiterating the importance of following basic business rules, Generally Accepted Accounting Principles (hereinafter "GAAP"), and the protocols required at Fannie Mae.

49.    Mr. Kimpson's education and training enabled him to understand the importance of following proper business procedures and Fannie Mae protocols. Because he was aware of the risks created by ignoring the protocols, Mr. Kimpson refused to process the amended purchase order until it was properly reviewed and authorized. In order to complete the purchase order after Mr. Kimpson's refusal, the supervisors had to compel a different employee into violating the required protocols. The Office of Corporate Justice later determined that the supervisors' conduct and processing of that amended purchase order violated Fannie Mae's Procurement and Disbursement Policy. Upon information and belief, Ms. Martin Edler, Ms. Stillwell, and Ms. Cahn received reprimands for their conduct related to that purchase order.

50.    Mr. Kimpson's refusal angered and embarrassed these supervisors as their lack of understanding and/or lack of respect for the importance of following proper accounting procedures, as well as Fannie Mae policies, had again been exposed by Mr. Kimpson. The supervisors' handling of that amended purchase order was yet another example of their belief that following proper accounting procedures was inefficient and detrimental to their efforts to increase the appearance of productivity within the department at any cost. The Office of Corporate Justice interviewed Ms. Stillwell and Ms. Cahn regarding the amended purchase order incident. In response to this interview, Ms. Stillwell and Ms. Cahn admitted that they considered it unduly burdensome and inefficient to review new requisitions and compare them to the original purchase orders in place for a given item. This response is symptomatic of their lack of understanding that protocols create efficiencies when properly implemented and followed.

51.    Prior to, and after, the February 2004 incident, Mr. Kimpson verbally expressed concerns to his supervisors regarding their refusal to follow proper accounting practices and

their violation of Fannie Mae protocols, as well as the risks created by such conduct. Despite Mr. Kimpson's expressions of concern, the supervisors continued to violate GAAP, as well as Fannie Mae protocol in their handling of requisitions and purchase orders.

52.    In March of 2004, Ms. Martin Edler and Ms. Lopez drafted Mr. Kimpson's evaluation for the year 2003. Predictably, these supervisors used this yearly review as an opportunity to retaliate against Mr. Kimpson for his refusal to violate proper accounting procedures and Fannie Mae protocol, and the embarrassment and anger his refusal caused them. Moreover, these supervisors utilized this evaluation to discredit Mr. Kimpson by falsely ascribing performance failures to Mr. Kimpson in hopes that he would resign.

53.    This evaluation described Mr. Kimpson as failing to complete projects and failing to meet deadlines. These criticisms are a direct result of tactics used by the supervisors throughout the year aimed at preventing Mr. Kimpson from completing his assignments. Ms. Stilwell, Ms. Lopez, and Ms. Martin Edler, consistently took actions throughout the year to ensure that they would be in a position to issue Mr. Kimpson a negative review. Mr. Kimpson refused to sign this evaluation, as it contained false and misleading statements about his performance.

54.    On March 11, 2004, in an attempt to bring his concerns to a higher level of management, Mr. Kimpson sent a letter to Ms. Cahn asking that his evaluation be reviewed and corrected. Mr. Kimpson informed Ms. Cahn of the inaccuracies contained in his evaluation, as well as describing some of the tactics used by his supervisors to ensure his failure. In this letter, Mr. Kimpson also reported to Ms. Cahn that he had explained to his supervisors that GAAP, as well as basic accounting rules regarding authorization of funding, were not being followed. Mr. Kimpson informed Ms. Cahn that he was reprimanded for bringing these

improper accounting practices to the forefront. A copy of this letter is attached to this Complaint as Exhibit E.

55.      Mr. Kimpson received no response to his letter. His complaints about being reprimanded for advising that GAAP procedures were not being followed remained unaddressed.

56.      Mr. Kimpson remained determined to correct his evaluation so that it would accurately reflect his contributions. Accordingly, on May 17, 2004, Mr. Kimpson wrote an additional letter to Ms. Cahn, again detailing the inaccurate statements made by his supervisors in his yearly review. Mr. Kimpson again asked that Ms. Cahn investigate the inaccurate statements made against him and correct his review so that it accurately reflected his accomplishments. A copy of this letter is attached to this Complaint as Exhibit F.

57.      Despite these two requests, the statements of the yearly review were never truly investigated, and Ms. Cahn allowed these inaccurate statements to remain in his record. Ms. Cahn elected to protect her fellow supervisors rather then investigate Mr. Kimpson's concerns regarding Fannie Mae's flawed policies and procedures. Mr. Kimpson has consistently refused to sign this evaluation as it still contains false and misleading statements about his performance.

58.      The statements made in Mr. Kimpson's yearly review, along with the refusal to investigate his complaints, were intended by Fannie Mae to defame Mr. Kimpson in pursuit of his being fired or forced to resign.

**The Office of Federal Housing
Enterprise Oversight Issues Its Report**

59.      On September 17, 2004, the Office of Federal Housing Enterprise Oversight (hereinafter "OFHEO") issued a report detailing its initial investigation of Fannie Mae's

17

financial practices. The OFHEO initial report found that Fannie Mae utilized improper accounting practices and lacked significant internal controls. Because of the seriousness of these findings, OFHEO issued this initial report and announced that it intended to continue its investigation.

60.    Specifically, OFHEO found that Fannie Mae maintained a dysfunctional and ineffective process for developing accounting policies. Overall, OFHEO found that Fannie Mae fostered an environment that impeded independent thinking, thereby preventing the development of adequate policies or procedures.

61.    On September 27, 2004, Fannie Mae's Board of Directors announced it would cooperate and assist OFHEO in its continued investigation. As part of this ongoing investigation, the Board announced that a review of the internal controls and policies related to accounting, staffing, and resources would be conducted. In response to OFHEO's determination that the internal audit department was ineffective and incomplete, the Board announced that in addition to the internal auditors, an independent counsel and an independent accounting firm would be hired to conduct a review.

62.    In December of 2004, in order to address the deficiencies found by OFHEO, Fannie Mae began making personnel and organizational changes in both the Controller's Office and the Office of Auditing. Fannie Mae began hiring personnel properly qualified to identify and correct contracting and accounting improprieties within the corporation.

63.    On December 13, 2004, on the heels of the news that qualified personnel would be joining the Controllers Office and the Audit Department, Ms. Martin Edler attempted to force Mr. Kimpson to resign. Ms. Edler offered him eight weeks salary in exchange for his resignation and waiver of all his legal rights against Fannie Mae. All of the supervisors of

CAPS knew that Mr. Kimpson represented a threat to their survival, given the ongoing review. Mr. Kimpson represented a threat because he knew that that these supervisors had ignored repeated warnings about the need to correct the accounting procedures in the Department.

64.      In December, Mr. Kimpson complained to a Fannie Mae supervisor that he was being retaliated against for his complaints. This complaint was referred to Fannie Mae's Office of Corporate Justice (hereinafter 'OCJ"). During the investigation of this retaliation complaint, Mr. Kimpson brought the February 2004 amended purchase order incident to the attention of the OCJ as an example of the wasteful, improper and dangerous conduct utilized by his supervisors. These supervisors terminated Mr. Kimpson before he could expose the full extent of their misconduct to the OCJ.

65.      Mr. Kimpson refused Ms. Martin Edler's ultimatum to resign. Instead, on December 18, 2004, he wrote a letter to United States Congressman James Clyburn. In this letter, Mr. Kimpson informed the Congressman of his concerns regarding the non-standard accounting practices and procedures in place at Fannie Mae. Mr. Kimpson also expressed concerns regarding management's lack of accounting experience or training. Mr. Kimpson further informed the Congressman that in retaliation for raising such concerns, his supervisors told him that his performance was inadequate, and asked him to resign. A copy of this letter is attached to this Complaint as Exhibit G.

66.      On December 20, 2004, Congressman Clyburn wrote a letter to Fannie Mae's then Chief Executive Officer, Franklin Raines. In this letter, Congressman Clyburn informed Mr. Raines of the letter he received from Mr. Kimpson and the content of that letter. Congressman Clyburn then asked Mr. Raines to investigate Mr. Kimpson's complaints. A

copy of this letter is attached to this Complaint as Exhibit H. Upon information and belief, no one at Fannie Mae did anything in response to Congressman Clyburn's letter.

### Inaccurate Cost Savings Determinations

67.      On January 14, 2005, Mr. Kimpson advised Ms. Lopez and Ms. Martin Edler that the cost savings' queries used to determine the amount of money saved by the Contract Procurement Services Department from year to year were improper and needed to be redesigned. The queries then in place determined cost savings based upon the supervisors' estimation of number of hours worked on a given project, rather than on the actual number of hours worked. This system allowed Ms. Lopez and Ms. Martin Edler, as well as the other supervisors, to manipulate cost savings by overstating in advance the number of hours required for a given project. These supervisors would then report cost savings by showing that the anticipated hours were reduced in actual performance. These savings did not actually exist. The supervisors created these inaccurate savings reports to falsely pad their numbers in order to fraudulently increase their yearly bonus awards. A copy of this message is attached to this Complaint as Exhibit I.

### The Audit of the Contract and
### Procurement Services Department Begins

68.      In late January 2005, as part of its ongoing internal investigation in response to OFHEO's findings, Fannie Mae directed its Office of Auditing to begin an audit of the Contract and Procurement Services Department (hereinafter "CAPS Audit"). The objectives of the CAPS Audit included evaluating the controls over the selection and approval of vendors, the processing of requisitions and purchase orders, management of contracts, and the processing of invoices and related disbursements.

69.    In February 2005, the auditors interviewed Ms. Stilwell as the first step in investigating CAPS. Upon information and belief, Ms. Stilwell falsely stated that she was unaware of any accounting improprieties in the Fannie Mae procedures then in place within the Department.

70.    Ms. Stilwell directed the auditors to coordinate with Ms. Lopez and Ms. Martin Edler in order to access necessary paperwork and personnel in their review. Ms. Lopez and Ms. Martin Edler were therefore able to dictate which personnel the auditors interviewed. Not surprisingly, the auditors never interviewed Mr. Kimpson. As the CAPS Audit progressed, the existence of improper accounting practices within the Department inevitably became exposed.

71.    On March 17, 2005, Mr. Kimpson sent an email to Ms. Martin Edler again expressing concerns regarding the requisition process. Specifically, Mr. Kimpson again expressed concerns about Fannie Mae's continuing practice of approving requisitions without being able to compare each requisition to the underlying contract. Mr. Kimpson recommended the development of a process whereby requests could be reviewed and approved to ensure compliance with the terms and conditions of the underlying contract. Ms. Martin Edler ignored Mr. Kimpson's concerns and allowed the continued use of this flawed and dangerous practice. A copy of this message is attached to this Complaint as Exhibit J.

72.    On March 18, 2005, Mr. Kimpson submitted a written request to Ms. Martin Edler, seeking four weeks of childbirth leave to begin in August of 2005, when his wife was due to give birth. Mr. Kimpson was entitled to this leave pursuant to the Family and Medical Leave Act. A copy of this request is attached to this Complaint as Exhibit K.

73.    In late March 2005, the auditors concluded their initial investigation into CAPS. The date that the audit findings would be released was uncertain.

74.     Prior to OFHEO's investigation and the corresponding CAPS Audit, Mr. Kimpson's supervisors were able to ignore his complaints and to continue using improper contract and accounting practices. The use of such practices allowed these supervisors to falsely report positive financial numbers, thereby satisfying upper management and avoiding any investigation of their practices.

75.     Discovery by the CAPS auditors or upper management that the supervisors of CAPS knew of the accounting improprieties before the CAPS Audit would likely lead to disciplinary action or possibly termination of those supervisors. Therefore, in order to survive the release of the CAPS Audit findings, these supervisors needed to appear unaware of the accounting improprieties.

76.     In order to appear unaware of the accounting improprieties, the supervisors of CAPS needed to eliminate Mr. Kimpson.

77.     Mr. Kimpson posed a threat of exposure to his superiors, as he had warned them of the accounting improprieties on numerous occasions over the course of the prior year and a half. These warnings were ignored by the Department supervisors, and they rebuked and punished Mr. Kimpson for bringing them to the forefront.

78.     Allowing Mr. Kimpson to remain employed at Fannie Mae meant risking exposure not only of these supervisors' knowledge of the accounting improprieties, but also of their willful and continued use of improper accounting in order to increase their yearly bonus awards.

79.     On April 5, 2005, before the CAPS Audit findings were officially released and before the auditors learned of Mr. Kimpson's complaints, Fannie Mae terminated Mr. Kimpson's employment. This termination was effective immediately in order to prevent Mr.

Kimpson from disclosing his supervisors' awareness of the accounting improprieties to his co-workers or the CAPS auditors.

80.     On April 29, 2005, Fannie Mae's Office of Auditing issued a report containing the findings of the CAPS Audit. The audit findings described the policies and procedures of the Contract Procurement Services Department as being outdated and inefficient. The deficiencies described in the CAPS Audit are strikingly similar to the issues Mr. Kimpson raised beginning in 2003. A copy of the report containing the findings of the CAPS Audit is attached to this Complaint as Exhibit L.

81.     Just as Mr. Kimpson warned his supervisors repeatedly, the CAPS Audit found that "policies and procedures need to be improved to provide consistent and detailed guidelines around the review and approval requirements for the contracts, as well as specific requirements pertaining to contract documentation, due diligence in the vendor selection process and contract monitoring." (CAPS Audit report pg. 1).

82.     Again, just as Mr. Kimpson warned in his March 10, 2003, March 24, 2003, and March 17, 2005, email messages, the CAPS Audit found that "[c]ontrols need to be strengthened to ensure that all vendor contracts, purchase requisitions, and purchase orders are approved based on the guidelines set forth in the approval matrices in effect when the transactions are initiated." (CAPS Audit report pg. 1)

83.     The CAPS Audit further found that "current and well documented procurement standards are necessary to ensure that expenditures incurred by the Company for goods and services are subject to adequate review and approval, to enhance the effectiveness of the procurement process, and to reduce the likelihood of fraud or non-compliance with applicable laws and regulations or Fannie Mae standards." (CAPS Audit Report pg. 4)

84.    The CAPS Audit report examined a random sample of thirty transactions, finding 13 instances where either purchase orders or requisitions were not properly approved in compliance with the applicable requirements. The CAPS Audit states that "[i]inconsistencies in the application of approval requirements increase the likelihood of unauthorized, wasteful, or potentially fraudulent transactions." (CAPS Audit Report pg.5).

85.    The CAPS Audit report findings confirm the existence of the problems about which Mr. Kimpson repeatedly warned his supervisors. Furthermore, these findings confirm the danger that Mr. Kimpson posed to his supervisors if the existence of his warnings became exposed. Fannie Mae wrongfully terminated Mr. Kimpson in order to allow these supervisors to appear unaware of the accounting problems being uncovered.

## WRONGFUL TERMINATION IN VIOLATION OF SARBANES-OXLEY

86.    Plaintiff hereby incorporates paragraphs 1 through 85 as if fully set forth herein.

87.    Sarbanes-Oxley prohibits any company with a class of securities registered under § 12 of the Security Exchange Act of 1934, or required to file reports under § 15(d) of the same Act, or any officer, employee, or agent of such company, from discharging, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because the employee provided information relating to alleged violations of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders. 18 U.S.C. § 1514A.

88.    Fannie Mae is a publicly traded company with a class of securities registered under § 12 of the Security Exchange Act of 1934. Fannie Mae is therefore subject to the Sarbanes-Oxley regulations.

89.    Section 13(b)(2)(A) of the Securities Exchange Act of 1934 requires every issuer with a class of securities registered pursuant to Section 12 to make and keep books, records, and accounts which accurately reflect the transactions and dispositions of assets of the issuer.

90.    Section 13(b)(2)(B)(i) of the Securities Exchange Act of 1934 requires every issuer with a class of securities registered pursuant to Section 12 to devise and maintain a system of internal controls sufficient to provide reasonable assurance that transactions are executed in accordance with managements authorization.

91.    Section 13(b)(2)(B)(ii) of the Securities Exchange Act of 1934 requires every issuer with a class of securities registered pursuant to Section 12 to devise and maintain a system of internal controls sufficient to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

92.    These provisions of the Securities Exchange Act are intended to prevent publicly traded companies and their officers from perpetrating fraud upon their shareholders.

93.    Mr. Kimpson's complaints to his supervisors were intended to protect shareholders by bringing Fannie Mae into compliance with Sarbanes-Oxley and with the Securities Exchange Act and to mitigate fraud, waste and abuse.

94.    Mr. Kimpson complained that his supervisors and Fannie Mae were in violation of the Securities Exchange Act and Sarbanes-Oxley in the following manner:

    a.    Failing to maintain internal controls on the selection of outside contractors;

    b.    Using non-approved outside contractors;

25

c.  Failing to follow corporate policies and procedures, albeit out-dated and inadequate procedures;

d.  Failing to maintain adequate controls to ensure that payments to vendors and outside contractors were authorized, legitimate, and properly reflected in the books and records of the company;

e.  Failing to maintain adequate controls to ensure that work orders, the quantity ordered, the amount paid, and the authority for such orders were properly reflected in the books and records of the company;

f.  Permitting supervisors to authorize payments to vendors in violation of Fannie Mae policy by "smurfing": i.e., making multiple payments less than $1 million to vendors to avoid obtaining management's written approval;

g.  Failing to maintain adequate controls so that requisitions paid were authorized and properly reflected in the books and records of the company;

h.  Creating a bogus formula for calculating the bonuses for supervisors in CAPS so as to fraudulently inflate their bonuses, which were therefore improperly reported in the books and records of the company and not authorized by management.

95.  Section 1514(a)(1)(C) of Sarbanes-Oxley protects employees when they provide protected information to any "person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)." 18 U.S.C. § 1514A (a)(1)(C).

96.  Mr. Kimpson's complaints provided information regarding the violations of the Securities Exchange Act of 1934 to a person with supervisory authority at Fannie Mae. Therefore, Mr. Kimpson's complaints are communications protected by Section 1514(a)(1)(C)

of Sarbanes-Oxley. Section 1514(a)(1)(B) of Sarbanes-Oxley protects employees when they provide protected information to any Member of Congress or any committee of Congress. Therefore, Mr. Kimpson's letter to Congressman Clyburn is a communication protected by Sarbanes-Oxley.

97.    In retaliation for his complaints and letters, which are protected communications under Sarbanes-Oxley, Fannie Mae punished and discharged Mr. Kimpson to cover-up its unlawful conduct and to protect supervisors from exposure of their incompetence and their unlawful deprivation of the rights of the stockholders.

98.    The practices about which Mr. Kimpson complained defrauded the stockholders of Defendant Fannie Mae and caused damage to the value of their investment through the perpetration of acts of waste, fraud and abuse and which were otherwise not in conformity with accepted business and accounting practices.

## RELIEF REQUESTED

**WHEREFORE**, Mr. Kimpson requests the following relief

A)    Back pay with interest, starting from April 5, 2005, until the date this matter is resolved.

B)    Special damages in the amount of $ 3,000,000 as compensation for the pain, suffering, humiliation, and embarrassment caused by Fannie Mae's actions.

C)    Damages to compensate Plaintiff for the loss of income and earning capacity that Defendant's conduct has caused, in an amount to be determined by the trier of fact.

D)    Punitive damages in an amount to be determined by the trier of fact.

E)    Litigation costs, including attorney's fees and all other costs related to preparation and litigation of this matter.

27

F)    Reinstatement with the same level of seniority status that Mr. Kimpson would have had, but for the discrimination.

G)    Any and all other relief that this Court deems appropriate in light of Fannie Mae's actions in this case.

## JURY DEMAND

Plaintiff Maxwell J. Kimpson demands a jury trial in this action.

Respectfully submitted,

THOMPSON O'DONNELL, LLP

J. Michael Hannon #352526
Sean G. Ryan #495067
THOMPSON O'DONNELL, LLP
1212 New York Avenue, N.W.
Suite 1000
Washington, D.C. 20005
(202) 289-1133
(202) 289-0275

Attorneys for Plaintiff
Maxwell J. Kimpson